THE STATE OF TEXAS v. THE GALVESTON CITY COMPANY.

1. After a recognition by the government of a grant to the extent of its boundaries for over thirty years, no cancellation of the same can be obtained on account of an excess of land covered by the grant.

2. The intent to mislead and defraud, and that the party was misled and defrauded, are necessary allegations in a petition to constitute a sufficient charge of fraud.

3. When a patent to land has been issued by the President of the Republic and Commissioner of the General Land Office, and was recognized by subsequent legislation of the Congress of the Republic, the State of Texas is estopped from denying the right of those claiming under it to the full extent of the boundaries set out in the patent.

APPEAL from Galveston. Tried below before the Hon. C. B. Sabin.

A general demurrer to appellant's petition was sustained in the court below, from which an appeal was taken. The character of the petition is sufficiently stated in the opinion.

*Mann & Baker*, for appellant.—The principles of law, that issuance of a patent is a ministerial, not judicial act— that if issued fraudulently, or without authority, or contrary to law, it is absolutely void and conveys no legal title as between grantor and grantee, has been fully established in Texas as well as in England, in the Supreme Court of the United States and in many of the States, as will appear from an examination of the following cases: Mason v. Russel, 1 Texas, 729, which cites and approves

Stoddard v. Chambers, 2 How., 318 ; The State v. Deles-
denier, 7 Texas, 109 ; Hancock v. McKinney, 7 Texas,
440 ; Johnson v. Smith, 21 Texas, 729 ; United States v.
Stone, 2 Wall., 535 ; Huidekoper v. Burrus, 1 Wash. C.
C., 113 ; Cromlin v. Minter, 9 Ala., 605 ; Barwick's case,
3 Coke's R.; Lord Chandos' case, 6 Coke's R., 55.) In
support of the proposition that a patent is but evidence
of title where land has been purchased and granted by
act of the Legislature, see the cases above cited, and in
addition the case of Goodlet v. Smithson, 5 Port. (Ala.),
248 ; McConnell v. Wilcox, 3 Illinois Reports (1 Scam.),
367.

Under this view of the law, how stood this matter at the
time of the adoption of the Constitution of the State in 1845?
Appellee had an inchoate right, by grant from the Repub-
lic, to a league and labor of land on and including the
east end of Galveston Island ; the right was inchoate, be-
cause the metes and bounds of the land had not been
established according to law.  The title to that amount of
land had vested by the grant; the evidence of title which
was to designate the boundaries not mentioned in the
grant would be a patent.  This they did not have ; their
pretended patent being absolutely void, in their hands,
for want of the prerequisite survey, and by the actual
fraud of grantee taking, knowingly, more than it was en-
titled to ; the excess embraced in the pretended patent
was then, as it is now, a part of the public domain, and
as such passed with the other lands of the Republic to
the State.  (See Articles of Annexation, Pas. Dig., 1st
Ed., p. 44.)  Passed, not by escheat or forfeiture, as
argued for appellee, but simply as part of the unsold
and ungranted land.

The second ground of demurrer urged by appellee in
the court below was that there are no allegations in peti-
tion that will sustain the charge of fraud.  The petition

alleges that no survey was made of the land described in the pretended patent; that the metes and bounds therein given are of such a nature that they do not show the quantity of land embraced by them, nor could it be ascertained by calculation, but would require an actual survey to ascertain it. That said metes and bounds contain an excess of 1700 acres over and above the quantity purchased and granted, and these facts were known to grantee and Commissioner of Land Office. Any act or omission of a legal duty, whereby undue advantage is taken of another, is fraud in equity. (Story's Eq. Jur., Vol. 1, Sec. 187.)

The case of Elliott v. Mitchell, 28 Texas, 111, decides that where there has been actual survey that grantee holds excess unless it be so great as to be a presumption of fraud. But stress is laid upon the fact that there was a survey. In White v. Burnley, 20 How., 248, where one locator in Texas was seeking to have a prior location set aside because of excess, in which the evidence was that the surveyor had knowingly returned field notes for more than the quantity of land granted, the Supreme Court of the United States says: "There is not the slightest evidence that Morales had any knowledge that the statement made by the surveyor in his certificate of survey was untrue, and therefore the grant as to him was not void."

Why would it have rendered the grant void for him to have known of the excess, if such knowledge is not fraud? It has been said by counsel that mere knowledge of excess is not fraud; that a fraudulent animus must be shown. Men are conclusively presumed to intend the necessary results of their actions. (Greenleaf on Evi., 1 Vol., Sec. 18.) After having taken 1700 acres, then, at rate paid for the league and labor, worth over $16,000, now worth over half a million, can they retain it by disclaimer of fraudulent animus? How can we show the

animus but by their acts, and that they were done with knowledge? .(Kerr on Frauds, 41, 42, 55.)

We allege that no survey was made, and on demurrer this would prevent the argument from being entertained, that the Secretary of the Treasury made a survey, and that a patent could issue.

Appellee claims that as there was no general land law at the time this land was granted, and as the grant does not state any further prerequisite than the payment of the purchase money, that therefore the patent was legally issued, even if there was no survey and no compliance with the requirements of the general land law. Supposing that prior to passage of general land law a patent might have issued without a survey—which we don't believe— still we hold that the law, as it stood at the date of its issuance, must be complied with. The law that governs all ministerial acts is the law of the date of those acts.

The act of 14th December, 1837, provides county surveyor shall certify all field notes which have been or may hereafter be made upon which patents are to be obtained. (Paschal's Digest, 1st Ed., Art. 4522.)

Another point argued for appellee was that excess don't avoid a patent. Our claim is on two grounds: 1. That their patent is void for fraud in obtaining it, and because issued contrary to law, and that the excess is the consequence of that fraud. 2. That fraud may be presumed from amount of excess, and that a patent may be opened on that ground by the State.

It was further claimed for appellee that the State's rights have been barred by limitation, and if not, that the demand is stale and lost by laches. Neither limitation nor laches apply to claims of the State of Texas for land. (Pas. Dig., 1 Ed., Art. 4624; Angel on Limitation, Secs. 34, 37.)

There is only one ground on which the claim of the

State can be affected by the lapse of time, and that is on the presumption of a grant. This is a presumption of fact, and must necessarily be consistent with the other facts in the case. (See Taylor v. Watkins, 26 Texas, 696; Yancy v. Norris, 27 Texas, 49.) In the case at bar, appellee is claiming possession of all the land under a grant of a certain specific quantity, and they cannot say they have no more than the amount granted; but if they have, then lapse of time has raised presumption of grant. Such an argument would be totally inconsistent.

If the State was in no better position than an ordinary vendor, still time would not have affected her rights at law or in equity, as there has been fraud in obtaining the excess, and concealment of fraud in retaining it. (See Munson v. Hallowell, 26 Texas, 486.) The concealment consisted in preventing any suspicion of the true state of facts from arising, by denying, as they do now, that they have any excess. But they say that the stockholders of the City Company are purchasers without notice. As the demurrer presents all substantial defects in the whole pleadings (Gould on Pleading, Chap. 9, Sec. 36) we can properly consider this plea. No principle of equity is better settled than that there can be no innocent purchaser of an equitable title. (Boon v. Childs, 10 Pet., 179, 211, 212; 2 Story's Eq., Sec. 1502; Vatier v. Hind, 7 Pet., 252, 271.) The stockholders of a company whose capital is land, if they can be called purchasers of the land when they buy but certificates of stock, would get but an equitable title in the land, the legal title being in the corporation. Besides, we are not suing the stockholders; we know no one but the City Company. The attribute of individuality by which the personal identity of the members was merged in the body corporate, the company, was the privilege granted by incorporation, and the members cannot be heard to say that they, as such, have any rights,.

as to third parties, separate or different from the company. As between themselves, the members can set up any equities that may arise ; but no case can be found where the members have, in suit by a third party, been allowed to allege any defense which could not be urged by the body corporate.

In the case of Mason v. Russell's Heirs (1 Texas, 729) Judge Lipscomb quotes from Stoddard v. Chambers, 2 How. U. S., 318, as follows : "It is true a patent possesses the highest verity. It cannot be contradicted or explained by parol ; but if it has been fraudulently obtained or issued against law, it is void. It would be a most dangerous principle to hold that a patent should carry the legal title, though obtained fraudulently or against law."

"The issuing of a patent is a ministerial act, and must be performed according to law ; if issued against law it is void, and those claiming under it acquire no right." (The State v. Delesdenier, 7 Texas, 109.)

"No title can be held valid which has been acquired against law. A patent which has been fraudulently obtained or issued against law is void." (Hancock v. Mc-Kinney, 7 Texas, 440.)

"A patent for land in this country is the act of a public officer, who acts under a special authority delegated to him by law, and which prescribes the terms upon which it is to be granted." (Huidekoper v. Burrus, 1 Wash., 66, 113.)

"The patent is not understood to be the title itself, but the evidence thereof." (McConnell v. Wilcox, 3 Ill. R., 1 Scam., 367.)

"In case of sales made by the United States, the law gives the right, and the patent may be considered, not as the title itself, but as the evidence by which it is shown

that the pre-requisites to a legal sale have been complied with." (Goodlet v. Smithson, 5 Port., Ala., 248.)

"It is true that patent possesses highest verity. It cannot be contradicted or explained by parol; but if it has been fraudulently obtained, or issued against law, it is void. It would be a dangerous principle to hold that a patent should carry the legal title, though obtained fraudulently or against law. Fraud vitiates all transactions. It makes void a judgment, which is a much more solemn act than issuing of a patent." (Cromlin v. Minter, 9 Ala., 605; Stoddard v. Chambers, 2 How. U. S., 318; United States v. Stone, 2 Wall., 535.)

*Ballinger, Jack & Mott,* and *Gray & Botts,* for appellee.—If this suit can be maintained, there is scarcely a land grant in the State of Texas but is the subject of a like suit.

The People v. Clark, 10 Barbour, 130, was a case of a *scire facias* in the State of New York to vacate a patent to lands granted under the British crown. Says the court:

"Every man who, on the twentieth of April, 1827, owned an inch of land in this State, held it under a grant from the king, or under a Dutch grant; and who for a moment can suppose that the men who made and sanctioned the Constitution would have consented to it, if they had understood that their title to the lands on which they had lived for forty years might at any time, before the year 1850, be taken from them or their children, because the king had been cheated in the year 1737?"

The language by which the State of New York asserted, in 1779, its rights as possessed by the king, was:

"That the absolute property of all messuages, lands, tenements and hereditaments, and all rents, royalties, franchises, prerogatives, privileges, escheats, forfeitures,

debts, dues, duties and services, by whatsoever names respectively the same are called and known in the law, and all right and title to the same, which next and immediately before the ninth day of July, A. D. 1776, did vest in or belong, or was or were due to the crown of Great Britain, be and the same, and each and every of them, hereby are declared to be, and ever since the said ninth of July, A. D. 1776, to have been and forever shall be vested in the people of this State, in whom the sovereignty and seignory thereof are and were united and vested on and from the said ninth of July, 1776."

Says the court: "There are no words in this section sufficiently broad to cover the claim now made by the plaintiff. * * Can it be supposed that they intended to disturb each other's title to lands which they respectively then held under the crown? They did not profess to claim every right of action which the king then had."

It is not only clear that no such right of action exists in the State as is claimed in this case, but its legislation has been careful to protect its citizens from annoyance from any like objections.

2. No fraud is shown in the procurement of the patent.

The demurrer admits only the allegations of the petition which are well pleaded. Those allegations are construed most strongly against the plaintiff.

General allegations of fraud cannot be regarded unless facts are shown which render the fraud apparent to the court.

Nor can averments be regarded which are repugnant to law and to the judicial knowledge of the court.

The alleged fraud consists in the charge that the patent was not based on "any data whatever from actual survey of the east end of Galveston Island to ascertain the land granted." That the metes and bounds were the sugges-

tion of Jones, and a combination between him and the Commissioner of the Land Office, Borden.

The facts of the case shown from the public laws of the State are, that on the day succeeding the act making the grant to Menard, an act passed declaring that "all islands belonging to the Republic shall be and are hereby reserved for the government use, except the President be authorized specially by Congress to sell them." (Digest, Art. 4248.)

On the twelfth of June, 1837, it passed "the act to dispose of Galveston and the other islands of the Republic of Texas;" which provided—

"That the Secretary of the Treasury be and he is hereby authorized and required to cause the island of Galveston, except the league and labor sold to M. B. Menard and associates, and all other islands within this Republic, to be surveyed in lots not less than ten nor more than forty acres each, and that he cause the same to be sold at auction to the highest bidder, on the second Monday of November next, at the State house in the city of Houston," etc. (Digest, Art. 4828.)

That this survey was made and sales took place are apparent from the legislation of the State (Art. 4249), and its judicial history. (State v. Delesdenier, 7 Texas, 102, 103; Franklin v. Kessler, 25 Texas, 142.)

3. No excess is shown to affect the patent made by the Republic.

It is apparent that in the computation of excess the "flats" are included. But the petition states that the area of the flats cannot be alleged. There is no averment of excess of "fast" land beyond a league and labor. The averment of excess is therefore attributable to the inclusion of the flats. But the Supreme Court, in a case of the greatest consideration, held that the flats—that is, the land covered by shallow water between the fast land and

the channel of the harbor of Galveston—were intended to pass as a necessary and indispensable incident and appurtenant to the grant to Menard and his associates by the Congress of the Republic. (City of Galveston v. Menard, 23 Texas, 349.)

Averments as to excess are: "That said patent included, in the metes and bounds given in it, seventeen hundred acres more than a league and labor; that Jones, Menard's agent, and Borden, the Commissioner of the Land Office, knew that the patent embraced and contained very many more acres than the league and labor.

"That the patent has for one of its metes and bounds the channel of Galveston Bay; that owing to the meanderings of said channel, the truth or falsity, correctness or incorrectness of said metes and bounds, and the amount of such gross excess, fraudulently obtained as aforesaid, cannot be ascertained by calculation without a survey."

Courts regard allegations with reference to the means of knowledge of the facts, and it is manifest that the allegations of excess are wholly conjectural, the petition admitting ignorance of the facts, that a survey was necessary to ascertain them; the character of the suit, in fact, being to obtain a survey in order to determine whether or not any excess existed, and the amount thereof.

The question then arises, what excess in a patent would render it liable to be avoided in a suit by the State? This is an inquiry in which, if your honors enter upon it, you will have the distinction of being the first explorers in this branch of the law. It is, to this day, in England and in the United States, an untried, unknown experiment. In the case of White v. Burnley, 20 How., 247, Judge Catron says: "No instance is recollected where the State has interfered by suit to reform a patent for excess in quantity." It is true he expresses the opinion that a case of excess

sufficiently gross could arise to justify a proceeding by suit to reform a grant, but the authority he cites for this is United States v. Hughes, 11 Howard, 552, a suit by the United States to cancel a patent which had been issued to the wrong person.

In a later case decided by that court, Lindsey v. Hawes, 2 Black, 559, a fractional survey supposed to contain five acres actually contained thirteen acres, and the court held the government bound by the survey, and that a claimant under the United States could not obtain any right to the excess ; and Mr. Justice Miller thus carefully states the limits of the power of the government itself :

" We do not deny the right of the government, which has sold land by the acre at a fixed price, to make a new survey before it parts with the title, and if there is more land than was paid for, to require the deficiency to be paid before it issues a patent."

The court say, in Hickman v. Tait, Cooke's Reports, 463 : " If the estates of purchasers and families depended on resurveys of old patented lands, fatal would be the consequences to the peace of men. &ast; &ast; These boundaries were made by an officer of the government, in whose acts the citizens are commanded by the fundamental laws of society to place confidence."

We have searched the reports with care, and whilst dicta can be found asserting the right of the State to such an action, the action has never before been brought. Says Coke : " As usage is a good interpreter of laws, so is non-usage. Where there is no example, it is a great intendment that the law will not hear it."

" The fact that plaintiffs have never before this commenced an action to vacate a grant made by the king because it was made upon false suggestions, furnishes strong evidence that the plaintiffs never had the right to bring such an action. It was Littleton's rule, 'Whatever never

was, never ought to be.'"    (1 Vern., 385; People v. Clark, 10 Barb., 143.)

This was the first grant made by the Republic of Texas, before it had any new land system, and before the offices of county surveyor were filled.

The court will take judicial knowledge of the usages of the times.    It may not judicially know the *locus in quo* beyond what it has already judicially ascertained; but it will presume that officials of that day knew their duties and performed them, unless the contrary is made plainly to appear.    *    *    *    *    *    *    *    *

Admitting a clear excess of 1700 acres of land, proper to have been computed as part of the grant, this gives no right of action in this case.

On this point we add a few observations.    What excess entitles the State to an action for its recovery?

This court must feel at a strange loss for guides in such an inquiry—to take the place of the actors then, surround itself with all the circumstances presented to them, and demark the line of official authority.    You will recognize the essential difficulty and the great danger of wrong involved, which to this time have prevented any such question from being brought to the decision of an English speaking court.

We submit that it must be an excess so gross as plainly to appear beyond the usage, discretion or jurisdiction of the authorities at the time.    The terms in 5 Haywood are well chosen.    It must be "an enormous and very extraordinary excess."    Indulging the presumptions which always attach in behalf of official acts, taking cognizance of contemporaneous official usage and practice, there must appear to have been a gross abuse of official authority and power.

"In the location and survey of claims arising under acts of Congress, like those of May, 1820, and May, 1823,

the executive department of the government has in general exclusive jurisdiction, and all questions arising upon their location and survey are administrative in their nature, and must be disposed of in the Land Office." (Ballance v. Forsyth, 24 How., 185.)

" Where a survey is necessary to a grant, this belongs to the executive department, and is binding and conclusive on the judiciary, except where it interferes with the vested rights of third persons." (Waterman v. Smith, 13 Cal., 373, 411, 416.)

" The duty of surveying is political, and cannot be interfered with by the judiciary, which can determine whether prior rights have been interfered with, but cannot correct the location nor locate it where it should have been originally made." (Moore v. Wilkinson, 13 Cal., 486.)

4.   The Republic and State of Texas have recognized and confirmed the patent to Menard, and it does not remain open to question.

In the case of The City of Galveston v. Menard (23 Texas, 404), the court say:

" The act of Congress of the fifth of February, 1840, incorporating the city of Galveston, defines its corporate limits by reference to the patent, as follows : 'All that section of territory lying between Seventh street and Thirty-first street, including the harbor and anchorage of Galveston, and running from the front line on the bay, as defined in patent or deed to the Galveston Company from the government of Texas, to the Gulf, between the streets aforesaid.' Here is a recognition on the part of the Congress that the title to Menard to the east end of Galveston Island had been made by a definite line, constituting the front line of the bay, in reference to the harbor or anchorage. This is at least evidence that the government understood the grant to Menard to extend to the

channel.   And if satisfied it was excessive, such a con-
firmatory reference would hardly have been made to it by
the Legislature.''

The court further refer to the act of February 16, 1852,
supplementary to an act granting certain powers to the
city of Galveston, which declared that said act shall not
be ''so construed as to alter or impair any of the rights
heretofore conveyed to Michael B. Menard, his heirs and
assigns, by patent from the Republic of Texas, dated
the twenty-fifth day of January, A. D. 1838,'' as a recog-
nition of the patent, and construction of Menard's rights
under the patent.

It is impossible that language can be more plain, not
only in recognition of the patent itself, but as a patent
from the Republic of Texas.

On the sixteenth of May, 1871, the Legislature enacted
a charter for the city of Galveston, which declared, Ar-
ticle 30, ''This act shall be deemed a public act, and may
be read in evidence without proof, and judicial notice
shall be taken thereof in all courts and places.''.

Article 11, Section 1, provides, ''That the limits of
said city shall embrace so much of the island of Galves-
ton from the point thereof on the east to Fifty-sixth street ;
or to include the league and labor of land known as the
Menard grant; *provided*, that said league and labor
shall extend beyond Fifty-sixth street.''

The Legislature can recognize and confirm even a title
absolutely null and void.   (Wilkinson v. Leland, 2 Pe-
ters, 627.)

In United States v. Freeman, 3 How., 565, the court say :
'' If it can be gathered from a subsequent statute in *pari
materia* what meaning the Legislature attached to the
words of a former statute, they will amount to a legisla-
tive declaration of the meaning, and will govern the con-
struction of the first statute.''

Edwards' Lessee v. Darby, 12 Wheat., 206, turned upon the validity of certain surveys made by commissioners in North Carolina, reserving salt licks and springs from survey. Some of the surveys did embrace salt springs. Subsequently the Legislature ordered the survey and sale of all salt licks and springs, except such as had been already surveyed. The court say :

"This provision must be construed as recognizing the validity of, and as ratifying the surveys made by the commissioners. The circumstance of the survey containing a considerable surplus, we think immaterial."

Commonwealth v. Penobscot, Proprietors, 10 Mass., 153, was an information on the part of the commonwealth claiming lands as public. The defendants claimed under a conveyance from Indian Sagamores, and a legislative confirmation thereof, as follows : "*Resolved*, That the twenty miles falls, so called, * * be and they are hereby considered the uppermost falls, * * referred to in the deed from Indian Sagamores," etc. The court held that the Legislature, with special reference to the instrument, had recognized it as a deed, and fixed a call in it ; and that as expressing an opinion, or as confirming the grant, the resolution was a legislative recognition of the Indian title.

In Vidal v. Girard's Executors, 2 Howard, 190, the Supreme Court of the United States held that an act of the Legislature, prohibiting any road or street to be laid out through land bequeathed by the late Stephen Girard for the erection of a college, without the consent of the trustees, was a legislative recognition of the validity of the trusts in Girard's will for the establishment of Girard College.

Lewis v. San Antonio, 7 Texas, 288. The city of San Antonio claimed six leagues of land to have been granted as *exidos* to the town in 1733 or 1734. The Congress of

Coahuila and Texas granted the city two leagues, and it was contended that this was intended and accepted as a limitation of their *exidos*, the government having granted other parts of the six leagues.

By an act of the Congress of the Republic, passed December 14, 1837, the lands, limits and jurisdiction of the city were made to include and comprehend all that tract of land originally granted to and comprising said city, with its precincts; and the council and justices of the county court were authorized to sell such public lots and parcels of land as may lie within their jurisdiction, and to which there is no legal claim or title, and to dispose of such houses, or other buildings, as may have formerly been the property of the corporation of said city. The original grant and its validity were denied.

Judge Lipscomb says, page 140: "It is not to be supposed that the fact of the claim of ownership of the land in question was unknown to the members composing the Legislature, and their action must have had reference to it." Again he says: "If the original grant of the six leagues was proved, but was inchoate and imperfect, the act confirmed it."

See also Melton v. Cobb, 21 Texas, 541; Freidman v. Goodwin, 1 McAllister, 147; Noble v. The State, 1 Iowa; Breckenridge's Heirs v. Ormsby, 1 J. J. Marsh, 255; Wilcox v. Jackson, 13 Peters, 514.

5. The State is estopped and barred by its delay and acquiescence of more than thirty-three years, and by the equitable circumstances of the case, from denying the validity of the patent to Menard.

The principles of estoppel bind the State. (Commonwealth v. Andre, 3 Pick., 224; Carver v. Astor, 4 Peters, 1, 87; Penrose v. Griffith, 4 Binney, 231; Nieto v. Carpenter, 7 Cal., 527; Magee v. Hallett, 22 Ala., 699; Bigelow on Estoppel, 277; Com. v. Smith, 4 Penn. Law

Jour., 120; 1 Wharton's Digest, Estoppel, 121; Commonwealth v. Moltz, 10 Barr, 530; White v. U. S., Devereux Rep., U. S. Court of Claims, 54; Swain v. U. S., Ib., 61; Spence v. U. S., Ib., 60; Erricson v. U. S., Ib., 61.)

The rules applicable to the government when it acts merely through ministerial officers in execution of general laws, and when it assumes the special character of a contractor, and acts by the particular expression of the legislative will, and through special agents, as a holder of property or rights of any kind, are essentially different.

In the latter it is subject, and peculiarly subject, to the rules which apply to individuals in the construction of their contracts and conduct. (Huidekoper's Lessee v. Douglas, 3 Cranch., 1; Bank U. S. v. Planters' Bank of Georgia, 9 Wheat., 904; U. S. v. Barker, 12 Wheat., 589; Bank of Kentucky v. Wister, 2 Peters, 318; People v. Clark, 10 Barb., 140; Bank U. S. v. McKenzie, 2 Brock, 392; Betts v. Ammonett, 4 An., 363.)

The legislative act required the President to issue the patent to Menard. This patent was in the public records. It was bound to know how he had performed that duty.

"I take it to be indisputable that a principal who neglects promptly to disavow an act of his agent by which the latter has transcended his authority, makes the act his own." (Gibson, C. J., Bredin v. Debarry, 14 Serg. & R., 30; Childs v. Digby, 12 Harris, 23.)

6. The State is barred by limitation and prescription. (Jones v. Borden, 5 Texas, 411; Lewis v. San Antonio, 2 Texas, 288; Herndon v. Cassiano, 7 Texas, 288; Paul v. Perez, 7 Texas, 338; McDonald v. Bell, 7 Texas, 378; Dangerfield v. Paschal, 11 Texas, 579; Morris v. Byers, 14 Texas, 278; Taylor v. Watkins, 26 Texas, 688; Yancey v. Norris, 27 Texas, 40; Walker v. Hanks, 27 Texas,

536; Ballard v. Perry, 28 Texas, 366; Mills v. McMaster, 30 Texas, 594; Galan v. Goliad, 32 Texas, 787.)

The statute of limitations of adverse possession for three years under title or color of title, of five years under a recorded deed, or of ten years as a naked trespasser giving title to six hundred and forty acres, does not bar the government. There is no positive, statutory bar. But the inference from thence that no limitation, no lapse of time, will bar the State is wholly illogical and unfounded. No statute applied formerly to the courts of equity, but they adopted a bar by analogy to the rules which governed courts of law. The question at common law was considered by this court in the cases in 7 Texas, and in State v. Purcell, 16 Texas, 305, and it was shown that presumptions were raised against the crown by analogy to the bar of the right of entry, and that the longest period fixed by our statutes would raise the "presumptive bar" even against the State.

The length of time and the circumstances which raise the bar have led to subsequent discussion, but we understand it to be the settled law of the court that a "presumptive bar" does exist. The lapse of time in this case certainly creates it.

The statute of limitations may not fix an express bar, but it furnishes the principles, the analogies by which the courts of this State, in the exercise of their equity powers, will be governed in its determination.

OGDEN, J.—The appellant brought this suit to recover certain lands claimed by the appellee on the east end of Galveston Island.

The petition alleges that in January, 1838, in compliance with an act of the Congress of the Republic of Texas, passed for that purpose, a patent or quit-claim deed issued from the Republic to M. B. Menard, his heirs

and assigns, who, upon the formation of a joint stock company called the Galveston City Company, had transferred to it his entire interest in and to the grant made by the Congress of the Republic. It further alleges that the patent or quit-claim deed issued to M. B. Menard contained a large excess of land over and above what the patent called for, and that the patent or deed was made to contain this excess of land through the fraudulent combinations and representations of the agent of M. B. Menard and the Commissioner of the General Land Office. The act of the Congress of the Republic of 1836, relinquishing to M. B. Menard one league and labor of land on the east end of Galveston Island, and authorizing the President to issue a quit-claim title to the same, and the patent issued by the President, in comformity therewith, on the twenty-fifth of January, 1838, are made a part of the petition.

The defendant filed a general demurrer and several special exceptions to the petition, which were sustained by the court, from which judgment the plaintiff has appealed.

The title to the land in controversy issued from the Republic of Texas, as a sovereign and independent State, with every attribute of nationality and power, whose sovereignty continued for about eight years after the issuance of the title to Menard; and the grant evidenced by the patent or deed was by specific metes and bounds.

There can be no doubt in regard to the authority of the Republic to make the grant and to recognize the boundaries as described in the title; and it was immaterial whether the title issued by the President contained more land within its boundaries than designated or not, if the then existing government, with a full knowledge of that fact, recognized and approved the same. Upon the issuance of the title papers, definitely describing the land

granted, the title to the extent of the defined boundaries passed and became vested in the grantee, subject to no inquiry or dispute from a party, but the government itself. Had that title been fraudulently obtained, or had it by any fraudulent representations or combinations been made to include or cover a large excess of land, whereby the government was defrauded and deprived of a valuable right, we think there can be no question that the Republic would have had ample power and authority to have had that set aside, in whole or in part, as justice and equity might have demanded. But the land included within the defined boundaries had been appropriated by the grant and issuance of the title, and it may be regarded as extremely doubtful whether the State of Texas succeeded to any right to call in question any grants of land made by the Republic, under the due forms of law.

It has not been the practice of our courts to look behind the protocol and testimonio issued by the Mexican government, if in form complying with the law, to ascertain whether the grantee was entitled to lands, or whether he had received more than he was entitled to ; on the contrary, where the protocol and testimonio have been executed in full compliance with the existing laws, and definitely describing the land granted by known and fixed boundaries, the courts have never disturbed those boundaries, though they usually contain a large excess over the quantity called for in the title. The Republic, by its legal and recognized agent, executed to M. B. Menard title to a certain tract of land, by known and definite boundaries ; and in 1840 these boundaries and the entire grant was clearly recognized by the legislative authority, in the act of incorporating the city of Galveston.

In 1837 an act was passed requiring the Secretary of the Treasury to cause the island of Galveston, except the league and labor sold to M. B. Menard and his asso-

ciates, to be surveyed off into lots. That survey was made before the title to Menard was executed, and his title was made to conform with that survey. The appellee then had a grant from the Congress of the Republic, which was duly surveyed off by a government surveyor, and a title was issued by the President and Commissioner of the Land Office of the Republic, and this title and the boundaries of the land conveyed were clearly recognized by the subsequent legislation of Congress. And we think the Republic of Texas, by these acts, would have been estopped from denying the title of appellee to the full extent of the boundaries set out in its title.

It is, however, denied that a survey was made, and is claimed, that upon the demurrer, this denial must be taken as true ; but we think a simple denial of a fact cannot put in issue the public laws of the country, or facts of historical notoriety, nor the evidence admitted by the pleadings. The acts of the Congress of 1837, ordering the survey of the island, and the fact that the island was surveyed in compliance with the act, are not denied by the pleadings, but are quite clearly established by the laws of the Republic and the judicial history of the country. (Pasch. Dig., 4249 ; The State v. Delesdenier, 7 Texas, 102.) And it might require something more than a simple denial to require proof of either, while the patent or quit-claim deed made a part of plaintiff's petition calls for the survey made by order of the government as a part of the boundaries of the land conveyed.

The Republic of Texas had conveyed all its title to appellee, and when it surrendered its sovereignty to the United States, and became an integral part of that government, it was stipulated by the articles of annexation that the State should succeed the Republic as owner of "all the vacant unappropriated lands lying within its

limits.'' The land described in the title exhibited by the pleadings in this case had been appropriated as had been hundreds of other tracts in a similar way, and it would not now be equitable or just to set aside any or all of those grants whenever and wherever they were found to contain an excess of land called for.

But the Legislature of the State passed an act in 1852 clearly recognizing all the rights conveyed under the grant to M. B. Menard in 1838, having especial reference to the title issued, and the land included therein. Again, in 1871 an act was passed granting a charter to the city of Galveston, which is declared to be a public act, and in which the boundaries of the Menard grant are clearly recognized and in effect confirmed. And now, after a clear recognition by the government of the grant to the extent of its boundaries claimed, for over thirty years, during which time important interests have grown up, and in which innocent purchasers have become involved, perhaps upon the faith of those repeated recognitions by the government, it is too late a day to claim a cancellation of the patent, because it may contain an excess of land called for.

But it is claimed that the patent was obtained through fraud, and is therefore null and void, and that the State is not bound thereby, notwithstanding the alleged fraud, if any, might and should have been known to the government for more than thirty years. But we think the allegations of fraud are too indefinitely made to require an answer by defendant below; and the demurrer admits only such allegations of the petition as are well pleaded. In the first place the petition fails to allege, with sufficient definiteness, any fraudulent acts or representations which did, or could, affect the validity of the patent. It alleges in substance that the metes and bounds described in said patent were made up, without any data, from actual sur-

3

vey; that the whole work of making out the metes and bounds was done at a great distance from the land; that the patent containing said metes and bounds was presented to the President as correct for his signature, and that the parties who made out the metes and bounds, descriptive of the land, well knew and intended that the same did and should embrace very many more acres than a league and labor. But there is no direct and specific allegation that they intended to cheat, deceive or defraud, and there is no allegation that the President who executed the deed, or any one else, was either cheated, deceived or defrauded. Story's Equity Jurisprudence, 204, says, that in order to constitute a fraud "the party must be misled by the misrepresentation, for if he knew it to be false when made it cannot be said to influence his conduct, and it is his own indiscretion, and not any fraud or surprise of which he has any right to complain." And again, the same author says: "The party must have been misled to his prejudice or injury."

The intent to mislead and defraud, and the fact that the party was misled and defrauded, are necessary allegations in a petition, in order to constitute a sufficient charge of fraud, and without them a petition would be demurrable. But it is alleged, perhaps as a badge of fraud, that there was no actual survey of the land attempted to be conveyed, and no return of any field notes to the Land Office, as required by law, and without which no patent could have legally issued. At the time of the issuance of the patent to Menard the land law of the Republic had not gone into operation. It is true that it had passed the Congress a short time before, but, if in force at that time, was not then generally understood by the people, and but few if any surveyors had been appointed to make surveys or return field notes; it is therefore reasonable to presume that no surveyor had been ap-

pointed under the general law for the island of Galveston, and it would now appear exceedingly hard at this late day that appellee should lose its title for not complying with a law that could not then have been executed. But this was a special grant made by an act of the Congress definitely pointing out its location, and prescribing no other act for the grantee but the payment of the purchase money, and making it imperative upon the President to execute a title upon the payment of the required sum, and a survey by a private individual, so as to obtain the exact boundaries, would have been all-sufficient for the foundation of a valid patent. But the Congress, by the act of 1837, provided for the survey of the whole island, excepting the Menard grant, into small tracts, and it is difficult to understand how the whole balance of the island could be run off into small tracts without ascertaining the exact boundaries of the tract excepted from the general survey.

We think the laws of the Republic, the repeated decisions of this court, and the general history of the country relating to that island, which may be judicially known to the courts, together with the admissions in the petition and exhibits in this case, establish beyond controversy the fact that the island of Galveston, including the Menard grant, was surveyed before the issuance of the patent in 1838, and that the boundaries of that grant, at least in part, were those established by that survey. The patent conveyed no inchoate right liable to be recalled or defeated at the pleasure of the government, but an absolute and indefeasible title, so far as the Republic was concerned, and the State succeeded to no authority or right to disaffirm or annul the solemn deed or grant of its predecessor. The District Court did not err in sustaining the demurrer to the petition, and the judgment is affirmed.

AFFIRMED.